Luminara Worldwide versus Liown Electronics. Mr. Vandagatel, please proceed. May it please the Court, Van Dagatel on behalf of the appellants with me as well as Tom Milliken. With the Court's permission, I'd like to focus on two issues this morning. The first being Luminara's lack of standing to sue for infringement of the patents in suit, and the second being the construction of the claim term pivot on which validity turned. But I also would like to save a little bit of time to explain why the situation for our clients is dire and why we need relief from the preliminary injunction almost immediately. So let's start with the standing issue, if I may. The problem here is that the sole owner of the patent suit is Disney Enterprises, Inc., which is not a party to the lawsuit. Moreover, it has the ability through the affiliate's provision to indulge any potential infringement by the defendants, and as a result, the current claim of Luminara has neither constitutional standing nor statutory standing. How can you say they don't have constitutional standing? That's a much lower bar. They've got an exclusive license, and they've got the right to sue. They've got the right to these products, to assign these products, assign the rights to these products. How could they not be injured by someone who is engaging in infringing conduct? Well, the question is whether they can unilaterally exclude us. If Luminara can unilaterally exclude us, then they have constitutional standing. But if Disney can allow us to practice the patents, then they don't have constitutional standing. And that's the situation here. We've got the provision section 2.2 of the Disney-Candela agreement. I think you're confusing the constitutional standing with the statutory standing. No, because I think that's what the case law says. The question is whether Luminara has the ability to prevent us, to exclude us. If Disney is allowed to unilaterally allow us to practice the patent, then they don't have constitutional standing. That's from the Wyeth case. Can I ask this? Put aside the label constitutional standing. Why does the answer to the can Luminara exclude Leone turn on the breadth of the affiliate provision? Why do you not say, even if the affiliate provision is narrow, Disney can, in fact, grant Leone a license to make these things under the operational control of Disney? And therefore, even under a narrow view of the affiliate provision, Luminara can't exclude you. Well, I agree with that, Your Honor. The district court took the analysis that directional operational control was required. That's the position that my opponent is taking. But I don't think it is required. But even if it were required to, well, let me get back to the provision here. Because there are three portions of the affiliate provision. One is general corporate affiliates, which are corporately related entities. Then there's operational control. And the third one is any entity operated under license from Disney. If the dispute, or at least part of the dispute, was about the scope of the affiliate provision, I guess I'm having trouble understanding how, when you look at the license agreement as a whole, that the narrow view as opposed to the broad view isn't really the one that makes sense and that at least under California loose contract interpretation law, that could be found. Well, there wasn't any resort to extrinsic evidence. California does have a liberal parole evidence rule. But all the extrinsic evidence was in control of the other side. I'm not sure how much extrinsic evidence one needs. I mean, all over these agreements, there seemed to be Disney's effort to kind of do everything possible to give either Luminara, as it now exists, kind of full rights. I don't think so. Except for what it wanted to do itself. Correct. And what Disney wanted all along was the free right to practice the patents and to have affiliates practice the patents. And this was very important. Disney is a licensing business. I mean, yes, it does make movies. Yes, it has cruise ships. And it has Disneyland. But a huge portion of Disney's business is licensing. And they wanted unfettered ability to license whoever they want under whatever terms they want. Even when they expanded the scope of Luminara, actually Candela's rights in 2012, it was subject to 2.2. That's expressed there. It's subject to Disney's retained rights, which have not changed. But the YF case, which has a lot of relevance to this one, it seems, expressly says the ability of Qualcomm to license its affiliates is also immaterial as there's no evidence or argument suggesting the defendants are Qualcomm affiliates. There's no evidence or argument suggesting you all are Disney affiliates. We are not. So why aren't you in exactly the same situation? No, the question really is the ability to exclude us, not the current status. You're absolutely right. YF says an exclusive licensee has the right to exclude others and is incapable of obtaining a license right from the other party. However, so that's the language, the broad legal language they use. But in application, they make it clear that several of the parties that were at issue in that case retained not only the right to practice but the right to license affiliates, almost identical language here, and that that didn't qualify under the incapable of attaining a license thing. I think the difference is that in some cases you're using the narrow definition of affiliates, which is corporate relatives. In this case, Disney insisted on two additional terms for itself, not for Candela, by the way. But just to be clear, then are you acquiescing in the fact that if the very narrow definition of affiliates, only corporate relatives were to apply, and that if that is all Disney retained, then you would not have an argument here? We are not. In light of YF. Then you better tell me head-on why you don't fall under YF. Don't tell me broad definition of affiliates. That's a separate question. Tell me if I construe affiliates narrowly. If you construe affiliates to mean strictly corporate relatives, we are not corporate relatives, and Disney would have to require... So why don't you fall squarely under YF then? Because I think the answer is that Disney can make us a corporate affiliate simply by licensing. No, that's the broad view. I said you can't use that. That's a separate question. Answer my question. Why don't you fall under YF? Because your case is on all fours with YF if affiliates is to have the same meaning, which I said you have to presuppose. If affiliates is the narrow definition of strictly corporate relatives, then I would agree. Then Luminara might have constitutional standing. That is not the scenario. I'm accepting your premise for purposes of this question. That's what you're supposed to do when a judge gives you a hypothetical. Eventually, after you buck them five times first. I'm agreeing with you that we are not a corporate relative of Disney and are not currently an affiliate. And you're agreeing with that, but YF says under those circumstances, it's enough. Even though they have that incapable of becoming language as though if in the future you could become an affiliate of Disney in the corporate ownership capacity, that's still not enough under YF because they applied it in that very case to Qualcomm. I read YF a little bit differently. How do you read YF differently? If you're going to tell me I'm wrong, then you've got to tell me why. I think YF stands for the proposition. Tell me where in the case I'm wrong. Where in the case do you see language that supports your view of YF instead of mine? I believe it's on pages 1266-67. What the court says here is that for a licensee to be the exclusive licensee of a patent, the licensee must be the only party with the ability to license the patent. It says it doesn't have to be. No, it says that... I agree with that, but it follows that... That was talking about the proposition that the defendants were asserting on appeal and the court was saying that's not accurate. And then it says this court therefore holds that an exclusive licensee does not lack constitutional standing to assert its rights under the license patent merely because its license is subject not only to rights in existence at the time, but also to future licenses that may be granted only to parties other than the accused. And then it went on to say that because the accused was not a Qualcomm affiliate, that there was standing. Isn't that your circumstance if we read the affiliate provision? If we read the affiliate provision narrowly, I would agree with you. Can I just ask, though? It seems to me there are... Why isn't the only narrow view of affiliate at issue one that extends beyond corporate relatives? At a minimum, the last clause allows Disney to license somebody that operates its business under Disney's control. Why can't that be Leone? It can be Leone. And moreover, it doesn't even have to be controlled. But I agree with you. It does not have to be controlled by Disney. But even if it is controlled by Disney, whether or not Disney has more than 50% corporate ownership, that's one in two parentheses. The second one goes on and says even if you don't have that scenario, you can go on and become an affiliate if you are operating under license from Walt Disney Corporation or any affiliate thereof. Can we go to the second standing issue, namely assume for current purposes that Luminaric can be a plaintiff. Why is Disney needed in your view? And if you could say anything as a practical matter about whether Disney can be expected to join voluntarily, I'd be interested in that as well. Let me give you my argument on prudential standing. It's undisputed that Disney Enterprises Inc. is the owner of this patent. And so to have prudential standing, Luminaric would have to join Disney as a party unless Luminaric holds all substantial rights. And in this case, Disney is not just a bystander here. Let's walk through what they have. Not only do they have the right to practice under Section 2.2, not only do they have the right to license at least some others under Section 2.2, they unilaterally control whether to maintain the patents in force at all. That control is left up to Disney. That's Section 12, which was relevant under PROPAT. Are there cases that actually hold? I know that there are cases that say one has to look at a lot of different rights, but actually hold that if you're an exclusive licensee in the sense that crosses the first threshold, that they do have a right to exclude you. Nevertheless, the patent owner, which has some rights, has to be joined even if the patent owner could not possibly sue you and create a risk of multiple litigation. Yes. I believe both Morrow and PROPAT are situations where the exclusive licensee with the sole right to sue in standing were not permitted to sue alone. Morrow and PROPAT. So it's not sort of a sine qua non. But in Morrow, if I remember right, I think I remember PROPAT pretty well, but in Morrow, if I remember right, didn't it explain that the reason, the alternative rationale that was important, which also doesn't support you here. Unfortunately, these cases, I don't love the language of it, but it says the most important thing is the right to sue. But in Morrow, what it said is, and moreover, another important thing is to make sure the owner of the patent has a right to defend against potential invalidation or unenforceability of the patent in the event that the exclusive licensee is brought. But here, Disney, because you don't want the patentee to be out of the whole ball game if it's his patent that's going to be destroyed. But Disney here acquiesced entirely in being bound by whatever happens vis-a-vis their defense of your patent. It did acquiesce, but it doesn't follow. I think Asymmetrics makes clear that it's not simply a question of whether the defendant could be sued a second time. The question is, do all substantial rights in this patent belong to Luminara, or does Disney have a significant set of rights? The bundle of sticks has been divided, no doubt. But I've talked about not only the right to practice, the right to license, the right to decide whether to have maintenance fees, it has some ability to veto assignments. So is it your argument that the affiliate provision doesn't matter then? That you think that they still wouldn't be the exclusive rights? Well, I think the affiliate provision is still relevant because it shows that Disney wanted broad rights to practice and allow others to practice, but it's not essential to it. What about the fact that they excluded from their definition of affiliates people licensed to artificial flame technology? Only artificial flame technology. I think that actually helps us, by the way, because it shows that it wasn't all about operational control. This was an intellectual property provision, and why would Disney license? But if you read in the context of the decision, they're talking about venues, theme parks. Well, and any other entity. And by the way, Disney has a very broad interest in licensing this to this type of company, for example. If you look at page 880 in the record, it's talking about Candela, talking about licensing the character Lumiere from Beauty and the Beast. These candles can come in the form of Disney characters. You could use all sorts of different lights and theme songs with the candles. We have a possibility of cross-license to Leone given Leone makes LEDs. There's a lot of reasons why Disney might want to license Leone. But getting back to the credential standing issue, apart from the ones I've mentioned, not only does it have a share of proceeds and notices, it even owns the right to all improvements under Section 9.2. Collectively, I realize individually just the right to some proceeds might not be enough, but collectively this is showing that Disney has a real interest in this patent and it needs to be here. Disney apparently doesn't want to be here. Why does it need to be here? I think that's the crux of what Judge Toronto was asking you earlier. We have cases that discuss 8 or 9 factors, but why? Why does Disney need to be here? It's relinquished its rights vis-à-vis validity and enforceability. It is willing to be bound and has expressly said so. It's relinquished its rights to participate in a litigation reserving only rights to hear about it in advance and to provide comments which don't have to be followed. I read carefully all of the retention. There's no chance of a duplicative lawsuit being brought. So why? Why does Disney need to be here? This is a narrow exception to the general rule that the patentee has to be present. Disney is the patentee. Only if it has no substantial rights can Luminara sue without Disney. Disney does have an interest, whether or not it can go ahead and sue these defendants later on. It has an interest in the outcome of this. It certainly has a financial interest. It decided to keep control of the... But it signed away all of that. It signed away its interests in what would happen to its patents in litigation. It did agree to be bound by the result of the litigation, but that doesn't mean it has no interest in ownership. Remember how this is structured. This wasn't an assignment in grant back. It wasn't that way in 2008. It wasn't that way in 2012. It's not that way in 2014-15. This was Disney retaining the rights and giving certain rights to Luminara. Even after all of the amendments, it remains in that posture. That means Disney has an interest here. You said before that Disney apparently doesn't want to be here. Do you think the result is that if we found that there was standing, but that Disney also should be joined, that the result would be the case would have to be dismissed? If Disney refuses to join and they are not... I think Judge Toronto asked the question, is there a possibility that Luminara could join them forcefully as a party defendant? There is the independent wireless case from the Supreme Court in 1926. Right. Why wouldn't that apply in granting this exclusive... exclusive license? It basically put itself in the position of making sure that the rights recipient was able to enforce them. If Luminara were to sue Disney, perhaps then Disney would be a party and we would not have a prudential standing. But as we stand here today, we have a preliminary injunction against us where the patentee isn't present. We think the patentee is able to indulge any infringement that we do, but even if you don't accept that, the patentee still has substantial rights. And again, on a preliminary injunction, you don't have to dismiss the case right now. You can find substantial doubt about standing and vacate the preliminary injunction on that ground. If I can turn to the merits, because we have, I think, quite a good argument on the merits as well. Again, there's at least a substantial question about the validity of Claim 1. You don't have to talk really fast. I'll give you more time. Well, I noticed that I was over... It's okay. I'm going to give you a little more time. Go ahead. So, Claim 1 is extremely broad. It's actually reprinted on the inside cover of... So tell us what pivoting means and why they got it wrong below. Why did the district court get it wrong? Well, first of all, the 455 patent concededly contains all the limitations but the last one, which has the hole in the bottom... Hey, go back to answering my questions. I thought we got to that point already. Pivoting. What does it mean and why did they get it wrong? That's your argument. That's your best argument. So go to it. Thank you. Because neither the claim language nor the specification nor the prosecution history supports the district court's requirement that the body of the pendulum be able to rotate randomly or chaotically in all three dimensions. What does the claim language say? It says just free to pivot when supported. The party stipulated to a definition of pivot to mean rotate around a point of access, essentially. That's what a pivot is and to pivot means to go around that access. There's nothing in the claim that suggests that. What's your best point as it relates to the written description to support your conclusion? Sure. The written description describes a whole variety of different embodiments that can be used. Not simply the one in Figure 1 where you have a V shape and a larger hole. That's covered by some dependent claims. But it also makes clear that you can have a fixed rod, a rigid support. You don't have to have the bigger hole. And if you don't, it's just going to rotate around that support. And moreover, it expressly discusses gimbals, multi-axis gimbals, as an alternative embodiment. Well, if the patent is directed to candles with chaotic movement, why is it wrong for the district court to assume that that chaotic movement was established by a pivoting mechanism? Well, first of all, the patent is really about kinetic movement. There is some discussion of chaotic movement, but the patent really focuses on kinetic movement, which means it's constantly moving. But in any event, we have, undisputedly, chaotic or random movement in two dimensions around the pivot in the 455 patent. So the real question is, do you have to have chaotic motion in three dimensions? I don't think you have to have chaotic motion at all, but to the extent you do, you certainly don't need to have it in all three dimensions. Let's consider not only the embodiments that are disclosed and not disclaimed, they're disclosed as alternative embodiments to Figure 1. The prosecution history discusses pivotal mounting, which is the language that's used at the top of Column 7. You pivotally mount the pendulum member. The PTO rejected that claim because the 455 patent disclosed pivotal mounting. And Disney acceded to that rejection and didn't traverse it. What it did is it added additional limitations. So we also have the 355 patent, which is a relative. And we know that patent has a claim that expressly recites chaotic motion in two dimensions. Disney knew how to claim this. It didn't claim it in this patent. And so there's no reason in either the claim language this is a plain English word which has an accepted meaning. There's no redefinition of the term to pivot in this patent. There's another portion of the specification that talks about free to pivot. That basically means it's not impeded from pivoting. The real question is what does pivot mean? And there's nothing in the specification that requires three-dimensional movement. And there's nothing in the prosecution history that does. At a minimum, again, even if we don't have a definitive determination from this Court, there's at least substantial doubt. And that alone is enough to vacate the preliminary injunction. Were there bases asserted in the motion for preliminary injunction beside the patent infringement? Yes. There was a tortious interference claim that the district court... Tortious interference with existing contract or prospective contract? Existing contracts with two distributors. That couldn't obviously justify the current injunction against 15 customers. And the district court just didn't reach that? Didn't reach it. There were fact issues about, first of all, did these distributors breach the contract? Their argument is that Luminar breached it, and so they covered by buying from Leone. Was the trademark claim an asserted basis for the theory? No. No. They tried to work that in a little bit to the irreparable harm side of the case, which is the third issue which I'm happy to reach if Your Honors would like. Just let me ask one more question on the claim construction. So what if there be a patent infringement? What if the claim asserted had been Claim 14 of the 166? Would that be different? Well, Claim 14 has additional elements, and we have, by the way, alleged invalidity contentions regarding Claim 14. We've got a petition for inter-parties review, which is pending on Claim 14. We would have asserted different art. The petition is pending, or the inter-parties review is pending? The petition is pending. We should get an institution decision later this month. So Claim 14 was never asserted at the preliminary injunction phase. They tried to add it in their briefs on appeal, but it was never asserted, so it would be a due process problem if we weren't able to put in defenses regarding that. We put in defenses on the sole claim that they asserted. So you're currently under the preliminary injunction, correct? Correct. And you began by saying, if you had time, which clearly you don't, but we'll just give you a sentence or so, why is it so dire, and did you ask for expedited briefing? Yes. Argument in this case? We did. We actually moved to expedite the appeal. We self-expedited our briefing. We filed everything as quickly as we could. Then we waited to be put on the next available oral argument calendar, but for some reason it was not put on the next available argument calendar, and we filed a motion to expedite oral argument, which was granted. That motion is at Docket 78. So why is it so dire? I mean, you've given me additional of you thinking it's dire, so now why? Well, I was going to say the evidence, if Your Honor needs it, of subsequent events is in there, and I'll summarize it for you. We've been under injunction for six months. Lyon has not been able to sell to its two main distributors. Its two main distributors haven't been able to get any products. We've basically missed the Christmas season at this point. The three major trade shows for this industry are in January. If we can't be at those trade shows, we're not going to be able to sell most products to the big boxes and everybody else for 2016. 2016 will be a larger shot. Okay, got it. All right, let's give Mr. Wright a chance. I'll give you back some rebuttal time. Thank you. Okay, Mr. Wright, you've got a short 30 minutes in which we're going to question you. It'll feel like two minutes, don't worry. We'll go very quickly. Well, I believe that the WIAV case is highly instructive, if not dispositive of the constitutional standing issue. I'd like to address, starting off, the prudential standing issue. You're not going to start with what you call the constitutional standing issue? Under WIAV, I think under any definition of affiliate, there is still constitutional standing. Under WIAV, Disney retained for itself the right to use the patent, and for others to have the right to use the patent, Disney would have to bring another party into their fold of affiliates. Now you just used the term that is being defined, so that seems to me cheating. It doesn't have to be a corporate relative. At best, it has to be somebody that is operating under operational control of Disney. So why couldn't Disney do that to Lyon? I guess I'm a little bit confused. The additional definitions under affiliate are ways to bring another party into the fold of affiliates. I don't know what the term fold means. There's definition, and the one everybody is arguing about is that last one. There's a question about whether Disney has to have operational control over the business that it is licensing. What I'm asking is, let's assume it does. It seems to me it is no narrower than that, and if it is no narrower than that, why does that not allow Disney, should it wish, to license Lyon and do it on the condition that Disney gets to control the candle business of Lyon? At the outset, I would not concede that Disney has the ability to grant licenses to the AFT patents under third parties. Under this agreement, Disney is the exclusive licensee. To affiliates. It does to affiliates. When a party becomes an affiliate, they also enjoy the rights that Disney reserved to itself, which is the right to make, use, practice, and enjoy the fruits of the invention. But affiliates exclude somebody who is just operating under a license on the patent. That's right. I think the purpose of that last definition of affiliates that we're talking about is that Disney cannot make someone an affiliate for the sole purpose of practicing the AFT patent. Okay, so they have one other thing in their business. I don't think that's a reasonable interpretation of that last part of the definition of affiliates. California law says you have to turn to the business realities of the case and what the parties intended. It's not reasonable to think that Disney could avoid or get around the exclusive license that it granted to Luminara with a gratuitous grant of a license, assuming it could do that, of the AFT patents, and then the theme song to Aladdin. I understand that your purposefulness argument in terms of overall what was attempting to be conveyed here, but under no state law can we read out terms expressly. So what is your best definition for how I construe or under license from? Because I can't construe it to solely be operated by because that's the predicate that came before. It sets out two different conditions, operated by or under license from. So they can't morph into just one. There's no state that allows me to do that when I'm construing language of contracts. So your thematic notions are well taken, but what do I do with that language? Well, I think a reasonable alternate construction of that language is that it's not just operated by the Walt Disney Company, but it's operated under a license from the Walt Disney Company. Well, that would rewrite it entirely and remove the or, right? You just made it one condition instead of how it's clearly set out as two. And you actually added a condition to the operated by. Not only do you have to be operated by, it has to come in the form of a license. It can't be a ring in the cracker box. I think as a matter of standard written English, that is one way to read that clause is operated by or operated under license from the Walt Disney Company. In order for that to help you, you need some sort of narrowish concept of what it means to operate under the license. So let's agree for a minute that you could combine the under license phrase with the word operated. Nevertheless, how does that narrow in a way that would exclude Leone? Well, it implies operational control. That's the narrow construction of that. And to suggest that Disney would somehow grant Leone a license to operate, Disney as Disney, which I think is what the intent of that was. No, none of this says as Disney. They don't have to operate as Disney. Nothing in here says you have to assume the Disney name. And I don't see how you can morph that into anything here. And in fact, I went online just out of curiosity. And I was trying to figure out Euro Disney, Paris Disney. How are these things connected? And what I discovered is that there are lots of things that are under Disney's control that in fact don't have the Disney name at all. At least appear to be. My extra record search on the web, which of course is completely accurate. So the point being, there's nothing here that says they have to change their name to Disney in order to be operated by, right? That's correct. I mean, gosh, these big companies like Disney, they have a million little companies that they operate that don't share their name. And that don't share their name, though. That's true. Well, I understand that your response to all this is that there is the separate carve-out that says, regardless of whatever affiliates is defined as initially, that separately say affiliates do not include people licensed only to the art of plane technology. So clearly, Lyon couldn't be licensed as an affiliate to do this, just what it's doing. That's right. So you say that only can't be talking about something gratuitous. It's got to be something more substantial. Where in the set of agreements, where in the agreements can we go to see what that more substantial thing must be? I don't think there's evidence in the record in that regard. And I think that I will concede that is an inartfully articulated clause. And when there is any ambiguity as to two definitions, we turn to, under California law, the business realities of the case. And that is what Luminaro's is relying on. I'm sorry, what's inartfully phrased about this as opposed to unhelpfully phrased from your point of view? So I think that under a license from the Walt Disney Company, that is... Are you talking about the section one at page 420? Or were we talking about this carve-out? I'm sorry, the reservation of rights. Yeah, I think that what the parties as business entities were trying to achieve there was to prevent any gratuitous circumvention of the exclusive license that Disney granted to Luminaro. What if Disney licensed their entire IP portfolio? You even have the right to Mickey ears. So it wasn't just artificial flame technology. They licensed somebody their entire IP portfolio. They're not operated by, they're not under control by, they don't have a 50% share of, they maintain their separate name. Would that be enough under this contract? All IP rights, which for a company like Disney is, wow, lots. So the question is, would that be enough to make them an affiliate? Without the AFT or including the AFT? Sorry, the artificial flame technology patents. Yeah, of course. Everything, all IP rights. I don't think that that would qualify as being an affiliate. I think we have to come back to WIAV there and look at the Qualcomm situation. And I think the court in WIAV said, okay, if that happens, and Disney brings into its fold as an affiliate in that way, then you have removed the cause of action against that defendant. But right now, in this case, none of these defendants are affiliates. And there is an injury, in fact, a constitutionally recognized injury, in fact, that Disney currently has against these defendants that gives it constitutional standing. Do you want to move on and just address prudential standing a little bit? All substantial rights? Yes. Luminara granted to Disney all substantial rights. The most important one here is the right to enforce the patents. And that right is unencumbered.  It's not subject to any kind of law. Luminara can indulge infringements under that grant, which is very important. But if that were the only factor, and suppose every other factor pointed the other way, I mean, I know we have cases that say that's the most important factor, but they still articulate the list of eight, the Azure factors or whatever. Certainly. And so is there one that's so dominant, if that were the case, that it would just wipe everything else out? Well, there are other important rights, of course. One is the right to sublicense. Disney has the ability to sublicense its rights. And again, that is an unfettered… No, not Disney. Disney doesn't have the right to sublicense. Sorry. Luminara has the right to sublicense its rights, and that is unfettered as well. Luminara also has the ability to assign its rights, to dispose of them. Now that is subject to Disney's consent, which won't be unreasonably withheld, but that isn't a sufficient derogation of this right. So when we look at the issues that undergird the prudential standing requirement, none of these defendants or any defendants can be subject to a second suit. No other party has the right to enforce the patents. And Leonis mentioned, well, you're also protecting the patentee. And as the panel has noted, Luminara has agreed to be fully bound by any result in any litigation or any challenge to the patents in front of the patent office, etc. So Disney granted to Luminara all substantial rights such that there really are no concerns, prudential concerns, so that Luminara can sue in its own name in this case. I'd like to also turn to… I assume that you would argue that even if you were wrong, and that if we thought Disney needed to be joined, that we should nonetheless reach the other issues, right? Absolutely. Is that your view? We should reach the other issue? Because all we'd be doing would be sending it back to the district court for a mandatory joinder. That's right. And the prudential standing requirement is, of course, curable. And do you think that you do have a right to compel Disney to join? Or do you happen to know whether the compulsion is not going to be necessary? Because Disney would do it, not… Yeah, I don't think there's evidence in the record to that effect, and I'm not comfortable saying what Disney would or would not do. What about the mandatory joinder, independent under the… Certainly there's an argument that they could be compelled to join as well. How do you compel them to join? I mean, our STC case says that Rule 19, involuntary joinder, is not available. So you would have to sue them in an independent lawsuit before you could compel them to join, and you'd have to establish that, in fact, they had an obligation to join. That's one hypothetical, but… Doesn't STC actually create an exclusion and acknowledge that joinder is mandatory for exclusive licensees? Or at least you could so argue. But doesn't STC actually say it expressly? I don't know. This is the other way around. STC says you can't join a non-consenting one, but part of consent is having been a patent owner who gives exclusive licenses. That's independent wireless. Understood. Okay, go ahead. Why don't you move on since we now know that even if we go against you on standing, you would like us to address the merits, which is helpful. So let's move on to those merits. So… Pivoting. You should focus on pivoting. I will focus on pivoting, Judge Morrison, since you said that's the most important issue. How do you get to this multidimensional, chaotic, whirling dervish requirement? I can explain how the district court got to that. No, I don't mean psychologically. How do you justify it is what I mean. Well, so I think the district court turned to, and properly so, turned to the desired effect that's stated in the preamble and that's stressed throughout the 166 patent to help ascertain the scope of the claim. And when the district court did that, Judge Nelson relied on Luminar's expert, Dr. Brown. Is flickering flame a claim limitation? You're saying relied on the preamble. Preamble's not normally, generally it's not a claim limitation. It's an exceptional case and I didn't see that flow from this case. It didn't flow from the district court's decision because I don't think any party put that particular issue in front of the district court. I think it's an open question whether the preamble is limiting, but I don't think ultimately it has to be to still distinguish claim one from the 455 Schnuckel patent. So the hallmark of anticipation, of course, is prior invention. Somebody got there first. And what the Schnuckel 455 patent describes is a well-known gimbal mechanism that supports a light channel that has effectively two degrees of rotational freedom. The aha moment here for the inventor was recognizing that I don't have to constrain the pendulum to rotate about the flame support element, if I can configure the hole so that the hole is free to pivot where it's supported by the flame support. So maybe some narrow claim does that or maybe it doesn't, but we have only claim one here. So I think that's supported by claim one when you... The question is whether it's required by claim one. It's required by claim one, of course. And it comes, of course, in the last element of the pendulum member. So you have a hole. The hole is configured to receive the flame support element such that the body is free to pivot when supported by the flame support element. That... So you need, but then what you need, and I guess everybody, this is the way the case has been presented, is a particular meaning of the term pivot that means something more than this, maybe even something more than this and this, but something else. Something more than a constrained rotation about an axis. And I think that when you turn to column seven, at the bottom of column seven in the 166 patent, the patentee distinguished a gimbal mechanism from what it describes as an alternative pivotal mounting provided by the combination of the pivot hole and support element. Now, Leon has tried to characterize that as an alternative and claimed embodiment. I'm sorry, what was that? I'm at the bottom of column seven of the 166 patent. It's at A164 and I'm at line 58. Yeah. So after describing what the 166 patent describes as a pivotally mounted support, it says that other mechanisms such as a gimbal or other joints allowing multi-axis movement as opposed to free pivoting movement may be used as an alternative to the pivotal mounting provided by the combination of the pivot hole and support element. So when you read that, that distinction between a gimbal mechanism and what the patent refers to as a pivotally mounted mechanism, you see that in claim one, what the patentee intended to do there and what one of ordinary skill in the art would have understood is that we are in a hole configured to receive a flame support element such that you are free to pivot when supported by the flame support element about that hole. But earlier in that same column, so if you go up to line 24 down to about 36, it talks about the nature of the support element defining the level of chaoticness, if that's a word, or the extent to which the movement is chaotic. That's a better phrasing. And it actually says that in other embodiments, though, it's preferable that the support element is rigid or semi-rigid and does not move with the pendulum member, which would imply that in those circumstances, even though it would still have to pivot, the movement wouldn't be chaotic. Well, I think there are multiple ways to achieve the pivoting there, and it can be achieved with a rigid support member as well. What the 166 patent focuses on is how do you configure this hole in the pendulum to get a better flickering flame effect, better than what you could get with, you know, there's a common inventor between those two, better than what you could get with a gimbal mechanism. So it's all about how is that hole configured, how far down the pendulum do you put the hole, how big do you make the hole, and then in addition, there are other things you can do with the pendulum member, or sorry, with the flame support member to increase that. So when you look at the totality of the 166 patent specification, as we have to do, and you look at what is being claimed here, it's a pendulum member, a hole below the body of the flame silhouette element, and that hole has to be configured such that it's free to pivot when supported by the flame support element. But why does it have to pivot in more than two dimensions? Why do you have to have more than two dimensions? Two axes, why? You can be chaotic in one axis. It could. Certainly you can have chaotic pivoting around one axis. A single axis, and you can certainly have it around two. So why does it have to be more than two? Why didn't the district court err when it went so far as to say it has to be more than two? Well, I don't think it has to be more than two to still be distinguishable from Schnuckel. I don't think it's the number of dimensions per se. I think why the district court didn't err when it addressed that argument is that it relied on Luminar's expert in that case to ascertain the scope of that flame element. The word is pivot. I don't understand why it has to be in three dimensions. So it's not just... I don't even know how to pivot in three dimensions. It's not just the word pivot. I think the main, just to answer that very... The word is pivot. That's the word we're considering. The body is free to pivot. Free to doesn't multiply the dimensions. I think free to pivot certainly implies that you are doing more than rotational. What is missing from Schnuckel is the ability to twist. Just to say, how can you pivot in more than three dimensions? In Schnuckel you can go this way, and in the gimballed mechanism you can go this way, but you do not have the ability to twist. That's... But that's not the plain definition of free to pivot. You want me to read into the definition all of what you say is necessary to distinguish from that prior art? The alternate theory that was put before the district court, which she addressed in a footnote because she thinks she needed to address it given what she did with free to pivot, was the nature of a hole that is configured to support... that when supported by the flame support element allows this free to pivot idea. Can I ask you, I guess, a kind of... I don't know whether it's a physics question or a mechanics question or something. If you have the support element going through the hole, the only way... Tell me if this is wrong. The only way you can get pivoting like this is to make the hole bigger, and that's what Claim 14 does by way of narrowing. Doesn't that almost prove that Claim 1 doesn't require that? Unless there's some other way besides... I mean, if the hole is hugging the rod, it can't move in that direction, right? Or can it? I can envision another way. You could have a hole, for instance... A wedge shape. Yeah, a wedge shape in the shape of an hourglass that comes through. In that case, the hole would be configured such that you can get that third dimension. But again, when you look at how one of ordinary skill in the art would read this claim in view of the 166 patent specification and in view of the 455 patent, which doesn't talk about pivots or pendulums, a pivot is simply the point of rotation in a lever system. A pendulum is a weight supported by a pivot, and that's the way the patentee here chose to claim this innovation, and he explicitly distinguished it from a gimbal mechanism in the specification at the bottom of column 7. Do you have any final thoughts? No, you're on. Okay. Thank you, Mr. Wright. We'll give two minutes of rebuttal to Mr. Bagatelle. I appreciate that I'm on borrowed time, so... And I'm going to borrow some of it myself. So can we start where he ended up? Sure. He said there's an explicit distinction from a gimbal mechanism at the bottom of column 7. Do you agree with that? No. Well, I do agree that column 7 discusses a gimbal mechanism as an alternative embodiment of the invention, and it says that's an alternative to the pivot hole 112 and the support element 113. Namely, if you look at figure 1 where that is shown, that's that V-shaped embodiment. So they're describing you don't have to do figure 1, which is our point. This is not any kind of a disclaimer of all gimbal mechanisms. That's certainly not the ground on which the district court rules. So you think this actually supports you? I do, and I think your point is exactly right. It lists a whole lot of different potential embodiments. Nowhere does this specification suggest that the invention is limited to this flexible line thing where it's got a dip and a bigger hole. That's all discussed in dependent claims. 1419 talks about the dip. Do I understand correctly that the description of the chaotic movement is often referenced as it relates to the changes in the electromagnetic field as opposed to the pivot? Yeah, it's true. The patent talks about a bunch of different ways to move things around, including variations in the electromagnetic field. All we have to have at the end of the day in this claim is some sort of a hole with a support member so that it's free to pivot in some way. It doesn't discuss all those articulating mechanisms. I suppose you could also have wind or a blowing mechanism or something like that for purposes of this patent because it doesn't require all the rest of that stuff. But the patent as a whole is talking about a variety of ways to articulate the thing. Really, to the extent there's any requirement, it's kineticness, which means that it's moving all the time, and we certainly had that in the prior article. Okay, Mr. Becatel, thank you very much. Thank both counsel for their argument. The case is taken under submission.